THE STATE EX REL. OLIVER CADILLAC COMPANY V. EDWARD E. CHRIS-
TOPHER, Building Commissioner and JOHN H. BROD, JR., Director
of Public Safety, of City of St. Louis, Appellants.—298 S. W.
720.

Court en Banc, September 27, 1927.

1. CONSTITUTIONAL PROVISION: Eminent Domain: Limitation: As
Affected by Word Damaged. The addition of the word "damaged" to the
word "taken" in Section 21 of Article 2 of the Constitution of 1875 did not
broaden the limitation of this eminent-domain clause, but operated only to
correct a prior error of construction of the eminent domain law.  In this
respect the interpretation of the words of that section declaring that
"private property shall not be taken or damaged for public use without just
compensation," ever since the decision in St. Louis v. Hill, 116 Mo. 527, has
been consistent with the universally accepted limitations upon the law of
eminent domain, and the word "damaged" did not place Missouri in a sep-
arate or unique class to herself.

Held, by GRAVES, J., dissenting, with whom BLAIR, J., concurs, that the
     addition of the word "damaged" to the constitutional section did
     broaden the field of consequential damages arising in cases wholly dis-
     associated with an actual physical taking by the exercise of the right
     of eminent domain, and created an additional limitation upon the right
     to use property for a public use, and requires compensation to be paid
     where property, though not actually taken, is damaged in its use to
     the owner.

Held, also, that the section was not an amendment of any existing constitu-
     tional provision, nor did it operate to correct previous errors of con-
     struction, but it created a new right, and nullified the prior decisions
     which had followed the English rule that the owner could not recover
     consequential damages for injury to his property caused by an ordi-
     nance changing the grade of a street.

2. ———: ———: ———: Taking or Damaging: Equal Protection: Due
Process.  A taking or damaging of private property for a public use with-
out just compensation, unless under circumstances which justify it under
the general police power, would be depriving the owner of his property
without due process of law and denying to him the equal protection of the
laws, in violation of the Fourteenth Amendment, and would also fall under
the ban of the due process clause found in the constitution of nearly every
state.

3. ———: ———: City Zoning: Compensation.  An ordinance, city-wide
in its operation, which seeks, under the police power, to impose restrictions
upon the use of private property through zoning, without compensation,
by restricting certain portions of the city to residence uses, others to mul-
tiple dwellings, others to commercial uses, others to industrial uses and
others to unrestricted uses, in accordance with the Enabling Act of 1925,
Laws 1925, page 309, does not violate Section 21 of Article 2 of the Constitu-
tion, declaring that "private property shall not be taken or damaged for
public use without just compensation."

**Held,** by GRAVES, J., dissenting, with whom BLAIR, J., concurs, that said Enabling Act and said ordinance, in that they provide for no compensation for the restricted use of property, violate said constitutional section; that to deny to the owner a lawful use of property is to deprive him of its most valuable quality, and is to damage it within the meaning of said constitutional provision; that said provision is peculiar among American constitutions, and under it, whatever may be the holdings in other jurisdictions, private property cannot be damaged for a public use without just compensation.

4. **CITY ZONING: Eminent Domain: Impracticable: Police Power.** To zone a great city through condemnation proceedings would be practically impossible; it must be zoned under the police power, or not at all. A city as a social unit is a living, organic thing, constantly changing, expanding, growing, and to attempt to divide it into districts restricted to residence, or commercial or industrial uses, by condemnation under the power of eminent domain, would tend to fossilize it and thereby defeat one of the essential purposes of zoning.

**Held,** by GRAVES, J., dissenting, that a restricted use of property, under the guise of the exercise of the police power through a zoning ordinance or statute, cannot be lawfully done without just compensation to the owner for the damages caused by the restricted use, until the constitutional provision declaring that "private property cannot be taken or damaged for public use without just compensation" is changed.

5. ———: **The Enabling Act: Police Regulation.** The Enabling Act of 1925 (Laws 1925, p. 308, secs. 2 and 3) authorized large cities to divide the municipality into districts, and within such districts to regulate and restrict the erection, construction, reconstruction, alteration or use of buildings, structures or land, such regulations to be made in accordance with a comprehensive plan, and designed to lessen congestion in the streets; to secure safety from fire, panic and other dangers; to promote health and the general welfare; to provide adequate light and air; to prevent the overcrowding of land; to avoid undue concentration of population; and to facilitate adequate provisions for transportation, water, sewage, schools, parks and other public conveniences and necessities; and an ordinance in harmony with such act is a police regulation, having a real relationship to congestion of traffic, to fire hazard, to the public health and to the public safety, and is a valid exercise of the police power, and is not to be considered as an exercise of the power of eminent domain. [GRAVES and BLAIR, JJ., and WALKER, C. J., dissenting.]

6. ———: **Arbitrary Classification: Residence District: Decaying Houses.** The exclusion of commercial and industrial establishments from districts set apart for flats, apartments, hotels, clubs, hospitals, schools and churches, although the dwellings and apartments are old and the hotels and club buildings large and imposing, is not an arbitrary or unreasonable classification. The necessary extra cost of police protection, street paving, and fire protection in a district devoted to commercial · or industrial uses is to be considered, as is also the right of residents, schools, churches, clubs and hospitals to be protected from noises, odors and other nuisances.

7. ———: ———: **Legislative Matter.** The wisdom or expediency of establishing a primary residential district or a secondary or quasi-residential district, and excluding from both commercial or industrial establishments, is for the city council to determine in the exercise of its legislative judgment.

8. ———: ———: **Convenient Stores.** The fact that the ordinance establishes here and there small commercial districts in which stores may be maintained within comparatively short distances from the residence dis-

tricts, and permits oil-filling stations, grocery or drug stores, beauty parlors, etc., to be maintained within these isolated commercial districts of easy access to the dwellers in the near-by residence districts, does not make the ordinance, excluding from the residence district large commercial or industrial establishments, a discriminatory or unreasonable exercise of the police power.

9. ————: ————: **Non-Injurious Establishment: General Regulation.** The fact that the particular commercial establishment excluded by the ordinance from a residence district, if permitted to exist, would not be harmful to the public health, safety or convenience, is of no consequence, if other establishments of its kind would be harmful. The ordinance must be general, and apply alike to all persons of a designated class; and if through its universality a member of the class, because of special circumstances, suffers hardship, that fact does not render the ordinance void as to him.

10. **BUILDING PERMIT: Application before Effective Day of Ordinance.** The fact that application for a building permit for a commercial establishment within the residence district was made before the zoning ordinance excluding such establishments from the district went into effect, is no reason why the ordinance should not be held applicable to the applicant after the ordinance became operative. The applicant held his lots subject at all times to every valid exercise of the police power, and the filing of the application gave him no vested right.

---

Corpus Juris-Cyc. References: **Eminent Domain,** 20 C. J., Section 13, p. 526, n. 86. **Municipal Corporations,** 43 C. J., Section 314, p. 299, n. 82; Section 364, p. 335, n. 52, 53, 62; Section 365, p. 336, n. 75; Section 366, p. 337, n. 88, 89; Section 369, p. 342, n. 35; p. 343, n. 55; Section 370, p. 344, n. 73.

Appeal from Circuit Court of City of St. Louis.—*Hon. Anthony F. Ittner*, Judge.

REVERSED.

*Julius T. Muench* and *Leonard J. Holland, Jr.*, for appellants.

(1)  Even though a garage may not be a nuisance *per se*, it is a matter of common knowledge that it is a potential nuisance and likely to cause harm if located in certain districts. The city was therefore warranted in enacting Ordinance No. 34103, prohibiting garages on Lindell Boulevard between Grand Avenue and Kingshighway. St. Louis v. Galt, 179 Mo. 8; St. Louis v. Russell, 116 Mo. 248, 255; State ex rel. v. McKelvey, 301 Mo. 48; People ex rel. Keller v. Oak Park, 266 Ill. 365; Re Russell, 158 N. Y. Supp. 162; Reinman v. Little Rock, 237 U. S. 171; Hadacheck v. Sebastian, 239 U. S. 394; Ex parte Quong Wo, 161 Cal. 220; In re Montgomery,

163 Cal. 457. (a) The respondent's proposed building is a garage, both as defined by ordinance and according to the commonly accepted meaning of the term. Revised Code of St. Louis 1914, sec. 2559; Webster's Dictionary. (b) Garages are modern substitutes for livery stables, and the rules applied to livery stables and similar kinds of business are applicable to them. 23 C. J. 1107; People ex rel. Keller v. Oak Park, supra. (2) Ordinance No. 35003 (the zoning ordinance), enacted in pursuance of the Enabling Act of 1925, authorizing zoning ordinances in cities, for the purpose of "promoting the health, safety, morals, or the general welfare of the community," does not violate any inhibition of the Federal or State Constitution, but is a valid exercise of the police power delegated to the city by the State of Missouri. State ex rel. Civello v. New Orleans, 154 La. 271; State ex rel. Beery v. Houghton, 204 N. W. 569; Wulfsohn v. Burden (N. Y.), 150 N. E. 120; Fourcade v. City and County of San Francisco, 238 Pac. 934; Spector v. Building Inspector (Mass.), 145 N. E. 265; Brett v. Building Commissioner (Mass.), 145 N. E. 269; State ex rel. Carter v. Harper, 182 Wis. 148; City of Aurora v. Burns (Ill.), 149 N. E. 784; Pritz v. Messer (Ohio), 149 N. E. 30; Pontiac Improvement Co. v. Board of Comrs., 104 Ohio St. 447, 459; Chicago Railroad Co. v. Drainage Comrs., 200 U. S. 561; Freund on Police Power, sec. 511; City of Providence v. Stephens (R. I.), 133 Atl. 614; Tighe v. Osborne (Md.), 133 Atl. 465; Morrison v. Pettigrew, 14 Fed. (N. Y.) 453; Gorieb v. Fox (Va.), 134 S. E. 914; State ex rel. Palma v. New Orleans (La.), 109 So. 916; Herring v. Stannus (Ark.), 275 S. W. 321; Little Rock v. Pfeifer (Ark.), 277 S. W. 883; Kroner v. Portland (Ore.), 240 Pac. 536; Deynzer v. Evanston (Ill.), 149 N. E. 790; City of Bismarck v. Hughes (N. D.), 208 N. W. 711; State ex rel. Roberts v. City of New Orleans (La.), 110 So. 201; Portnoff v. Bigelow (N. J.), 133 Atl. 534. (3) While Ordinance No. 35003 was not in effect when the respondent's application for a permit was made, it had been passed almost a month before and was to take effect two days after. The appellants were therefore warranted in refusing the permit, on the ground that no use could be made of it by the respondent without violating the law. Ware v. Wichita, 113 Kan. 153; In re Cherry, 193 N. Y. Supp. 57; Spector v. Building Inspector, 145 N. E. 265; Miller v. Board of Public Works (Cal.), 234 Pac. 381; Fox-Lane Corporation v. Mann, 215 N. Y. Supp. 334. (4) Under the circumstances shown in evidence, it was not unreasonable to designate the district in which the property in controversy is located as a multiple dwelling district, as it was in the use map forming part of Ordinance No. 35003. Authorities cited under Point 2.

*S. L. Swarts, Louis Kawin* and *Caulfield & Bartlett* for respondent.

(1) The new zoning ordinance is the same in purpose and effect as the former zoning ordinance of St. Louis. It undertakes to restrict the legitimate uses of private property throughout the city. It undertakes to deprive owners of proprietary rights in their propety without compensation and without due process of law. It is, therefore, unconstitutional and void. State ex rel. Better Built H. & M. Co. v. McKelvey, 301 Mo. 130, 256 S. W. 495; State ex rel. Penrose Inv. Co. v. McKelvey, 301 Mo. 1. c. 256 S. W. 474; St. Louis v. Evraiff, 301 Mo. 231, 256 S. W. 489; St. Louis v. Hill, 116 Mo. 527; St. Louis v. Dreisoerner, 243 Mo. 217, 147 S. W. 1000; State ex rel. Better Built H. & M. Co. v. Davis, 302 Mo. 307, 259 S. W. 80; Laws 1921, p. 481; C. B. & Q. Railroad v. Chicago, 166 U. S. 226, 236; State ex rel. Knese v. Kinsey, 282 S. W. 439; Calvo v. New Orleans, 136 La. 480; Willison v. Cooke, 54 Colo. 320; Spann v. Dallas, 111 Tex. 350, 235 S. W. 513; Hill v. Storrie (Tex.), 236 S. W. 234; Dallas v. Mitchell (Tex.), 245 S. W. 944; Dallas v. Burns (Tex.), 250 S. W. 717; Marshall v. Dallas (Tex.), 253 S. W. 887; Fitzhugh v. Jackson (Miss.), 132 Miss. 585; State ex rel. v. Edgecomb, 108 Neb. 859; Lucas v. State, 21 Ohio Law Rep. 363; Ignaciunas v. Risley (N. J. L.), 121 Atl. 783; Plaza Apartment Hotel Corp. v. Hague (N. J.), 126 Atl. 421; Cooper Lumber Co. v. Dammers (N. J.), 125 Atl. 325; Pinck v. Jelleme, 126 Atl. 926; Falco v. Kaltenbach, 128 Atl. 394; Union County Dev. Co. v. Kaltenbach, 128 Atl. 396; Nelson Bldg. Co. v. Binda, 128 Atl. 618; Ingersoll v. South Orange, 128 Atl. 393; Plymouth Co. v. Bigelow, 129 Atl. 203; Goldman v. Crowther (Md.), 128 Atl. 50; Rudensey v. Board of Adjustment, 131 Atl. 906; Tighe v. Osborne (Md.), 149 Md. 349; Byrne v. Maryland Realty Co., 129 Md. 202, 210; Bostock v. Sams, 95 Md. 400; Stubbs v. Scott, 127 Md. 86. (a) The restrictions in the new zoning ordinance, excluding commercial establishments, including the one proposed to be erected and maintained by relator on the corner of Sarah Street and Lindell Boulevard, when applied to the relator's premises, are unreasonable, oppressive and void. Such restrictions have no reasonable relation to the purposes of the police power. They take relator's property without due process and without compensation. They are unconstitutional and void. Cases cited above; Euclid v. Ambler Realty Co., 47 U. S. Ct. 114, 120, 71 L. Ed. Adv. Op. 171; City v. Hill, 116 Mo. 527; Const. Mo. sec. 21, art. 2; St. Louis v. Dreisoerner, 243 Mo. 223; Laws 1925, p. 309, secs. 1, 3; City of Little Rock v. Pfeifer (Ark.), 277 S. W. 884; Wilmington v. Turk (Del.), 129 Atl. 522. (b) The restrictions in the zoning ordinance excluding, as they do, an automobile salesroom which re-

lator proposes to establish, and at the same time permitting in the same vicinity storage garages on the ground floor or in the basement of hotels, apartments, or tenements are discriminatory. They deny to relator the equal protection of the laws. Likewise, the restrictions barring relator from establishing its business on Sarah Street at its intersection with Lindell, but permitting such business on Sarah Street across an alley from relator's property, less than thirty feet away, and elsewhere in the city, without regard to the density of population, the narrowness of the streets, the proximity of dwelling houses, are arbitrary and discriminatory, denying to relator the equal protection of the laws. 14th Amendment U. S. Constitution; Barbier v. Connolly, 113 U. S. 31. (c) The zoning ordinance is a local and special law in violation of the Missouri Constitution. Sec. 53, Cl. 32, Art. IV, Constitution of Missouri; Ex parte Lerner, 281 Mo. 18, 218 S. W. 331. (2) Relator's proposed building and its intended use will not constitute "an oil filling station, a garage or other business, occupation or practice liable to be a nuisance or detrimental to the public health, morals, security or general welfare," and hence will not violate the "Lindell" Ordinance. (3) The new zoning ordinance was not in force or effect when relator applied for the permit and could not bar relator's right thereto. St. Louis Charter, art. 4, sec. 19; Keane v. Cushing, 15 Mo. App. 96; Singer Mfg. Co. v. Shull, 74 Mo. App. 486; Rehmann v. Des Moines, 204 N. W. 267; Dobbins v. Los Angeles, 195 U. S. 223, 49 L. Ed. 169; Paffendorf v. Lyndhurst Township, 129 Atl. (N. J. L.) 389.

RAGLAND, J.—For a concise statement of the general nature of this action, its objective and the parties thereto, we quote from appellants' brief:

"This is a proceeding in mandamus, brought by the State at the relation of the Oliver Cadillac Company, a corporation, against the appellants, as Building Commissioner and Director of Public Safety, respectively, of the city of St. Louis, to require them to issue the Oliver Cadillac Company a permit for the erection on a lot at the southwest corner of Lindell Boulevard and Sarah Street, in St. Louis, of a two-story, reinforced-concrete, brick-and-stone building, with a basement, to be occupied and used as a place of business for the display, sale and adjustment of automobiles, and for the sale and installation of automobile parts and accessories.

"The lot in question has a front of 258 feet on Lindell Boulevard, and runs back 213 feet along Sarah Street to an alley. The proposed building was to occupy the eastern 170 feet of the lot, and was to be set back thirty feet from the property line on Lindell.

"The petition charged, and the evidence showed, that the relator, the respondent here, had on May 24, 1926, applied to the appellants, the respondents below, for a building permit, and had at that time complied with the requirements of the then existing building code. It was admitted that the permit had been refused. Application was thereupon made for an alternative writ of mandamus, which was issued on May 24, 1926, and was served on the appellant Brod on May 25th, and on the appellant Christopher on May 26th.

"The permit was refused on the grounds, first, that the proposed building constituted a garage within the meaning of Section 2559 of the Revised Code of 1914, and its erection would therefore violate Ordinance No. 34103 of the city of St. Louis, prohibiting garages on Lindell Boulevard between Grand Avenue and Kingshighway; and, secondly, that, being a business structure, the building could not be constructed without violating the provisions of Ordinance No. 35003, the new zoning ordinance, which was to go into effect two days later, and which placed the lot on which the building was proposed to be erected in the multiple dwelling district, in which commercial and industrial buildings were prohibited."

The zoning ordinance referred to became effective May 26, 1926. Its purported authorization and objectives are disclosed by its preamble and title, as follows:

"In order to avail itself of the powers conferred by an Act of the General Assembly, approved on the 30th day of April, 1925, Laws of Missouri, 1925, page 309, the city of St. Louis, through its legislative body, has heretofore appointed the members of its City Plan Commission to be and constitute a commission known as the Zoning Commission, to recommend the boundaries of the various original districts into which it is proposed for the purpose of this ordinance and pursuant to said act, to divide the city and to recommend appropriate regulations to be enforced therein. Pursuant to said appointment, said Zoning Commission has prepared and made a preliminary report, held public hearings thereon, and thereafter made and submitted to the Board of Aldermen its final report, recommending the boundaries of said original districts and the regulations to be enforced therein.

"An ordinance to regulate and restrict the height, number of stories, bulk, volume and size of buildings and structures, the size of yards, courts and other open spaces, the location, erection, alteration and use of buildings, structures and land for the purpose of promoting the health, safety, morals and general welfare of the city of St. Louis; and for said purposes to divide the city of St. Louis into districts; to provide for change of the regulations, restrictions and boundaries of such districts; to provide for a Board of Adjustment;

317 Mo. Sup.—75.

to provide for enforcement, to prescribe penalties for violation of the provisions hereof.''

As its title indicates the ordinance is a comprehensive one. It zones the entire city: (1) into use districts and (2) into height and area districts. The pertinent portions of Sections 2, 3 and 4 are as follows:

''Section 2. In order to regulate and restrict the location, erection, alteration or use of buildings, structures or land, the city of St. Louis is hereby divided into five Use Districts, known as:

1. Residence District.
2. Multiple Dwelling District.
3. Commercial District.
4. Industrial District.
5. Unrestricted District.

''The city of St. Louis is hereby divided into the five districts aforesaid and the boundaries of such districts are shown upon the map attached hereto, being designated as the Use District Map, and which is hereby made a part of this ordinance.

''Section Three. In the Residence District no building or premises shall be used and no building therein shall be erected or structurally altered except for the following purposes:

1. One Family Dwelling.
2. Two Family Dwelling.
3. Church.
4. Schools offering instruction in primary, secondary or collegiate courses of study.
5. Library, museum, playground, park or recreational buildings which are owned or operated by the Municipality.
6. Accessory Buildings; including one private garage or private stable when located not less than thirty feet from the front lot line and not less than five feet from any side street line; or a private garage constructed as a part of the main building.

''Section Four. In the Multiple Dwelling District no building or premises shall be used and no building therein shall be erected or structurally altered except for the following purposes:

1. Any use permitted in the Residence District.
2. Multiple Dwelling.
3. Hotel.
4. Private Club or Lodge, excluding any which has as its chief activity a service customarily carried on as a business.
5. Boarding or Lodging House.
6. Hospital or clinic.
7. An institution of an educational, philanthropic or eleemosynary nature.

8. Accessory buildings; including private and storage garages when located on the same lot not less than thirty feet from the front lot line, and not less than five feet from any side street line unless constructed as a part of the main building; however, it shall be permissible to maintain and operate a storage garage in the basement or on the ground floor of fireproof hotels and apartments, which garage is to be operated and maintained for the use of the guests or tenements residing within such hotel or apartment.''

The provisions creating a Board of Adjustment and delegating to it certain powers follow closely Section 7 of the Enabling Act. [Laws 1925, p. 309.] Appeals to this board may be taken by any person aggrieved or by any officer, department, board or bureau of the municipality affected by any decision of an administrative officer. And in passing upon appeals, where there are practical difficulties or unnecessary hardships in the way of carrying out the letter of the ordinance, the board is authorized to vary or modify the application of any of the regulations or provisions of the ordinance relating to the use, construction or alteration of buildings or structures or the use of land so that the spirit of the ordinance shall be observed, public safety secured and substantial justice done. However, every such variation or modification must be reported immediately to the Board of Aldermen and embodied in the ordinance by way of an amendment thereto before it can become effective. All decisions of the Board of Adjustment are subject to review on *certiorari* by the circuit court.

None of the used districts into which the city is divided by the ordinance is composed of compact or contiguous territory. The multiple dwelling district, for example, consists of many widely separated areas. The one involved in this case is triangular in form, the base resting on Kingshighway and the apex extending east to Grand Avenue. The triangle is bi-sected by Lindell Boulevard. Kingshighway forms the eastern boundary of Forest Park. Sarah Street crosses Lindell Boulevard five blocks east of Kingshighway and three blocks west of Grand Avenue. Whittier Avenue comes into Lindell Boulevard from the south about a half block west of Sarah Street, and Vandeventer crosses Lindell Boulevard a block east of Sarah. The *locus in quo* is at the southwest corner of Lindell and Sarah. One of respondent's witnesses made a survey with reference to the uses of both sides of Lindell Boulevard from Whittier to Vandeventer. He found that the great majority of the buildings were used as multiple dwellings; rooming houses, apartments and hotels. In addition to these he found three oil-filling stations, two automobile show and sales rooms, one drug store, one grocery store and two other

buildings used for commercial purposes which he was unable to describe. The City Planning Engineer also made a survey. He testified that ninety-three per cent of Lindell Boulevard between Kingshighway and Grand Avenue (calculated by the front foot) was used for "dwelling," within the meaning of that term as defined by the ordinance.

As heretofore stated, the building which respondent seeks a permit to erect is a two-story, reinforced concrete, brick-and-stone structure with a basement, presumably fireproof. It is to front 170 feet on Lindell Boulevard and extend back south along Sarah Street 213 feet to an alley. According to the architect the building was designed to be used as a sales room for automobiles, the front portion on Lindell Boulevard being intended for a show room for new automobiles, and the portion on the Sarah Street side for a show room for second-hand automobiles, while the portion on the alley is intended to be used by people who come in to have their automobiles inspected. The sales manager of respondent said that it would probably carry in stock at all times eighteen or twenty new cars, and have on sale for customers from twenty to twenty-five used cars; that a part of the new cars would be placed on the second floor and the major adjustment work would be done on that floor.

It is conceded that the intended use of the building is commercial or industrial, and therefore one which the ordinance forbids in a multiple dwelling district.

The ground principally stressed by appellants as a justification for their refusal to issue the permit sought is that the building is to be erected and used in a multiple dwelling district for commercial or industrial purposes, in violation of the zoning ordinance. The respondent answers: (1) that the zoning ordinance, considered in its general aspect, is unconstitutional and void because (a) it provides for the taking and damaging of private property for public use without just compensation, (b) it deprives owners of their property without due process of the law, and (c) it denies them the equal protection of the laws; (2) that as applied to respondent's property, all the facts and circumstances considered, it violates the constitutional provisions just referred to, even though in its general application it might be deemed to be valid; and (3) that it can in no event operate to deprive respondent of the right to the building permit in question, because such permit was applied for before the ordinance became effective. These contentions of respondent indicate the scope of our inquiry.

I. The constitutionality of zoning laws as applicable to large cities has been so fully considered recently in a multitude of cases

arising in almost all of the jurisdictions of this country that little
Eminent     remains to be said on the subject.   It has been suggested,
Domain.     however, that the Constitution of Missouri and a few
others are somewhat unique in respect to the limitation
which provides "that private property shall not be taken *or damaged*
for public use without just compensation" (Sec. 21, Art. II, Consti-
tution), and consequently that such limitation puts Missouri in a
class separate and apart from the jurisdictions in which the validity
of zoning laws has been upheld.   The usual provision is that private
property shall not be taken for public use without just compensation;
whether the addition of the words "or damaged" in our Constitution
broadens the limitation must be determined from the construction
which we have put upon the provision containing them.

"When we amended the Constitution, in 1875, so as to permit a
recovery for property damaged in the taking of other property for
public purposes, it became a serious question as to what meaning
should be given to the amended constitutional provision.   In Van
DeVere's case (Van DeVere v. Kansas City, 107 Mo. 83), this court
threshed out the question, and the ruling in that case has never been
departed from in any subsequent ruling." [GRAVES, J., in Peters
v. Buckner, 288 Mo. l. c. 636.]   In that case we said:

"Our Constitution of 1875 declares 'that private property shall
not be taken or *damaged* for public use without just compensation.'
The same clause in prior constitutions did not contain the word
*damaged*; and the first question is whether the change in the organic
law secures to the plaintiff compensation for the damages which he
will sustain under the circumstances of this case.   Previous to the
Constitution of 1875 a very restricted meaning had been given to
the words *taken* and *property*.   Thus it was held in St. Louis v. Gurno,
12 Mo. 415, and affirmed in Taylor v. St. Louis, 14 Mo. 20, that the
city was not liable in damages resulting to a property-owner from
grading and paving a street, where the work was done under an ordi-
nance authorized by the charter.   The reason assigned was that to
grade a street dedicated to public use was not the appropriation of
private property to public use, but simply the exercise of a lawful
power over what had become public property, and that the property-
owner had no remedy for such consequential damages.   And in Hoff-
man v. St. Louis, 15 Mo. 651, the same rule was applied where the
grade of the street had been changed.   The rule of these cases was
disapproved in Thurston v. City of St. Joseph, 51 Mo. 510; but in
the case of Schattner v. City of Kansas, 53 Mo. 162, the court re-
turned to the old doctrine, and so the law continued down to the
adoption of the Constitution of 1875.   .   .   .

"The eminent domain clause was amended so as to include cases where property is damaged, as well as 'taken,' to overcome the hardship growing out of the old rules. . . . .

"The amendment must be construed and applied in view of the evils which it was designed to remedy. We have seen that before this amendment there were many cases where the *corpus* of the property was not taken, yet rights directly annexed to the property were injured, and that for such consequential damages the property owner had no remedy, because the act was authorized by law. Whether the plaintiff must now, in all cases when claiming that his property has been 'damaged' for public use, show that the injury is one for which he might have maintained an action if the act had not been done by authority of law, we need not say in this case. What we do say is this, that he must show that the *property itself, or some right or easement connected therewith,* is directly affected, and that it is specially affected." [Van DeVere v. Kansas City, 107 Mo. l. c. 87-88, 89-91.]

In order to determine what is a "taking" of private property, in a constitutional sense, Mr. LEWIS states the principle thus:

"If property, then, consists, not in tangible things themselves, but in certain rights in and appurtenant to those things, it follows that, when a person is deprived of any of those rights, he is to that extent deprived of his property, and hence, that his property may be taken, in the constitutional sense, though his title and possession remain undisturbed; and it may be laid down as a general proposition, based upon the nature of the property itself, that, whenever the lawful rights of an individual to the possession, use or enjoyment of his land are in any degree abridged or destroyed by reason of the exercise of the power of eminent domain, his property, is *pro tanto*, taken, and he is entitled to compensation." [1 Lewis on Eminent Domain (3 Ed.) sec. 65.]

That the text embodies the rule of construction now universally applied by the courts abundantly appears from the cases cited in the foot notes appended to Section 65 and Sections 66, 67 and 68 supra. Our own holdings have been in consonance with it ever since the decision in St. Louis v. Hill, 116 Mo. 527.

In view of the foregoing it is clear that the addition of the word "damaged" to that of "taken" in the eminent domain clause of our Constitution did not broaden its limitation. The amendment operated *to correct an error of construction* and nothing more.

There is another reason why Missouri does not occupy a unique position with respect to the constitutional safeguards with which she hedges the taking of private property for public use. A taking or damaging of private property for a public use without just compensation, unless under circumstances which justify it under the gen-

eral police power, would be depriving the owner of his property without due process of law and denying him the equal protection of the laws, in violation of the 14th amendment of the Constitution of the United States; such a taking or damaging would also fall under the ban of the "due process" clause found in the constitution of nearly every state in the Union. [C. B. & Q. Railway Co. v. Drainage Commissioners, 200 U. S. 561; Norwood v. Baker, 172 U. S. 269; Staton v. Railroad, 111 N. C. 278.]

Again, the Constitution of Illinois contains a provision limiting the exercise of the power of eminent domain practically identical with ours as to wording; yet it apparently never occurred to the Supreme Court of that State that such a provision was an insuperable barrier to the adoption by cities of zoning laws of the character of the one involved in this proceeding, for without specific reference to the provision that court sustained the validity of such laws. [City of Aurora v. Burns, 149 N. E. (Ill.) 784.]

In State ex rel. v. McKelvey, 301 Mo. l. c. 38, it was held by a majority of this court as then constituted that city zoning is a public use for which private property may be taken. In Kansas City v. Liebi, 298 Mo. 569, an ordinance designed to impose zoning restrictions upon a limited city area, under the power of eminent domain, was held to be valid. In the case at bar an ordinance city-wide in its operation seeks to impose, under the police power, restrictions upon private property through zoning, without compensation. Under the holding in the Liebi case its regulatory provisions would be constitutionally valid if compensation were provided for. Are its restrictions confiscatory in the constitutional sense because uncompensated? It was said by GRAVES, J., in State ex rel. v. McKelvey, supra, l. c. 22:

"In a broad sense no property or property right can be taken from the individual except through the police power of the State. This power may be exercised to abate a nuisance, to restrict the uses of property to lawful and non-deleterious purposes, or to take private property, or rights growing out of property, for public use upon payment therefor. In other words, eminent domain is but a limited use of the police power of the State. I know that cases and text-writers distinguish between the police power and eminent domain, but in ultimate analyses the basic principle of eminent domain is the inherent police power of the sovereign State. So that, in my judgment, eminent domain is but the limited exercise of the police power. So that in some cases rights in property may be limited, through the police power, without compensation, whilst other cases require compensation."

But what are the cases in which rights in property may be limited, through the police power, without compensation? and what those

which require compensation? What principle of constitutional law
determines the classification? The author of a recent
**Police** text-book on zoning law attempts to answer the ques-
**Regulation.** tions thus: "The analysis of the cases seems to show
that it (the line of difference between the police power and the power
of eminent domain) is largely one of degree. Is it reasonable and
proper, under all the circumstances, that the public good sought
should be attained without compensation to those whose rights are to
be limited to this end? If, on the whole, those affected are benefited
by the measure, if the right surrendered can no longer, in the light
of advancing public opinion, be retained in its fullness by its present
possessor, if the sacrifice to him is slight or if the number affected is
great, so that compensation is impracticable—in all such cases com-
pensation is not provided for; otherwise the law demands it. In
the decision, history, custom, opinion, as well as surrounding circum-
stances play their part." [Williams on the Law of City Planning
and Zoning, p. 25.]

To zone a great city like St. Louis through condemnation proceed-
ings would be practically impossible. But aside from that the city
as a social unit is a living, organic thing; all the while changing,
expanding, growing; a zoning by condemnation under the power of
eminent domain would tend to fossilize it and thereby defeat one
of the essential purposes of zoning. It must be zoned therefore under
the police power, or not at all.

By the Enabling Act heretofore referred to, the Legislature has
said to St. Louis and other municipalities: You may divide the mu-
nicipality into districts, and within such districts regulate and restrict
the erection, construction, reconstruction, alteration or use of build-
ings, structures or land. Such regulations, however, shall be made in
accordance with a comprehensive plan, and designed to lessen conges-
tion in the streets; to secure safety from fire, panic and other dangers;
to promote health and the general welfare; to provide adequate light
and air; to prevent the over-crowding of land; to avoid undue con-
centration of population; to facilitate the adequate provisions of
transportation, water, sewerage, schools, parks and other public re-
quirements (Secs. 2 and 3, Laws 1925, p. 308); and this the ordinance
under consideration purports to do. If its provisions may be re-
garded as a reasonably appropriate means of accomplishing the ends
so specified, it is a valid exercise of the police power. In this con-
nection it should be said that the test is not whether the individual
members of this or any other court think the ordinance wise or expe-
dient, that was for the determination in the first instance of the leg-
islative body which passed it; before we can hold it invalid we must
find that its provisions have no real or substantial relation to the evils
of congestion in the streets, fire hazard, over-crowding, etc. [Pritz

v. Messer, 149 N. E. (Ohio) 30; State ex rel. v. Harper, 182 Wis. 148.]

The principle of zoning as applied to large cities has been worked out through the conclusions reached by students of social science. It is strongly advocated by various eminent scientific bodies, the Council of Social Agencies, the Public Health Federation, the American Association of Engineers, and the American Institute of Architecture as a means of promoting the public interests specifically designated in the Enabling Act. As a result of this advocacy a strong demand for zoning legislation has arisen. To meet such demand the Secretary of Commerce of the United States appointed a commission of experts to prepare a "standard enabling act." The act so prepared has been the basis of the enabling acts of twenty states, including Missouri. [Forty states in all have passed laws authorizing zoning ordinances.] On January 1, 1925, according to the Supreme Court of North Dakota, zoning ordinances were in effect in 320 municipalities with an aggregate population of 24,000,000 citizens. [City of Bismarck v. Hughes, 208 N. W. 711.] The views of sociologists and others who through study and investigation are competent to form opinions, with respect to city zoning, are now generally accepted. In the light of these it cannot be said that the ordinance in question, considered with reference to its general features, has no real relationship to congestion of traffic, to fire hazard, to the public health and to the public safety.

As intimated at the outset the constitutionality of city zoning laws has been so fully and painstakingly considered by so many courts of last resort, including the Supreme Court of the United States, that for us to attempt a general survey of the police power and then point out the particular features of such laws which bring them within its constitutional sphere would be a work of supererogation. We therefore deem it sufficient to say that we are in accord with predominant judicial opinion which holds that an ordinance of the general character of the one involved in this case is a valid exercise of the police power. Some of the cases so holding follow: Village of Euclid v. Ambler Realty Co., 4 U. S. Sup. Ct. Ad. Op. 171; The Opinion of the Justices of the Supreme Judicial Court of Massachusetts, 234 Mass. 597; Miller v. Board of Public Works (Cal.), 234 Pac. 381; State ex rel. Civello v. New Orleans, 154 La. 271; State ex rel. Beery et al. v. Houghton (Minn.), 204 N. W. 569; Wulfsohn v. Burden (N. Y.), 150 N. E. 120; Spector v. Building Inspector of Milton (Mass.), 145 N. E. 265; State ex rel. v. Harper, supra; City of Aurora v. Burns, supra; Pritz v. Messer, supra; Pontiac Improvement Co. v. Board of Commissioners, 104 Ohio St. 447; City of Providence v. Stephens (R. I.), 133 Atl. 614; Tighe v. Osborne (Md.), 133 Atl. 465; Gorieb v. Fox (Va.), 134 S. E. 914; State ex rel.

Palma v. New Orleans (La.), 109 So. 916; Herring v. Stannus (Ark.), 275 S. W. 321; Little Rock v. Pfiefer (Ark.), 277 S. W. 883; Kroner v. Portland (Ore.), 240 Pac. 536; Deynzer v. Evanston (Ill.), 149 N. E. 790; City of Bismarck v. Hughes, supra; State ex rel. Roberts v. City of New Orleans (La.), 110 So. 201.

11.   Having reached the conclusion that the ordinance in its basic aspects is constitutional, we come next to consider some of its special features which respondent challenges as arbitrary and unreasonable.   The principal point of attack is the character of the district from which the ordinance excludes all commercial and industrial uses.

**Classification.**   The district appears to embody as its central feature Lindell Boulevard between Grand Avenue on the east and Forest Park on the west. Lindell Boulevard is a continuation of one of the main traffic arteries leading from the heart of the down town business district west to. the city limits.   The district in question is practically surrounded by commercial districts and there are a few such here and there within its general boundaries.   The buildings within the district, characterized according to use, consist largely of old dwellings, boarding houses, rooming houses, flats, apartment houses both large and small, hotels, club buildings and schools. Many of the hotels and lodge and club buildings are large and imposing structures.   Owing to the conditions just mentioned respondent insists that the district is a decayed residential district into which business and commerce have pushed their way in the course of the natural growth and expansion of the city and by reason thereof is no longer suitable for residential purposes.   Hence the ordinance in attempting to exclude business uses therefrom is palpably arbitrary and unreasonable.

Respondent's contention in its final analysis strikes at the basis of classification adopted by the ordinance.   It concedes apparently the reasonableness of a classification which excludes business or commercial uses from a purely residential district, that is, one having only one or two family dwellings in it; but denies that a classification which excludes such uses from a district in which are found apartment houses and hotels is based upon any intrinsic, natural or constitutional distinction.   Now, the ordinance excludes from "residence districts" flats, apartment houses and hotels, and its validity in this respect can no longer be questioned.   [Miller v. Board of Public Works, supra; Wulfsohn v. Burden, supra.]   Then must those who dwell in flats, apartments or hotels, whether through necessity or choice, be subjected to the conditions which obtain in commercial or industrial districts?   Those conditions which justify on the ground of the public welfare and comfort the exclusion of business from residence districts have been set forth at length in many recent

decisions of the courts. In State ex rel. Civello v. New Orleans, supra, l. c. 282, it is said:

"In the first place, the exclusion of business establishments from residence districts might enable the municipal government to give better police protection. Patrolmen's beats are larger, and therefore fewer, in residence neighborhoods than in business neighborhoods. A place of business in a residence neighborhood furnishes an excuse for any criminal to go into the neighborhood, where otherwise, a stranger would be under the ban of suspicion. Besides, open shops invite loiterers and idlers to congregate; and the places of such congregations need police protection. In the second place, the zoning of a city into residence districts and commercial districts is a matter of economy in street paving. Heavy trucks, hauling freight to and from places of business in residence districts, require the city to maintain the same costly pavement in such districts that is required for business districts; whereas, in the residence district, where business establishment are excluded, a cheaper pavement serves the purpose. It is pointed out, too, that the fire hazard is greater in the neighborhood of business establishments than it is in residence districts. A better and more expensive fire department—better equipment and younger and stronger men—are needed in the business centers, where the buildings are taller, than in the residence districts.

"Aside from considerations of economic administration, in the matter of police and fire protection, street paving, etc., any business establishment is likely to be a genuine nuisance in a neighborhood of residences. Places of business are noisy; they are apt to be disturbing at night; some of them are malodorous; some unsightly; some are apt to breed rats, mice, roaches, flies, ants, etc. Property brings a better price in a residence neighborhood where business establishments are excluded than in a residence neighborhood where an objectionable business is apt to be established at any time."

Many of the reasons suggested in the foregoing for excluding business establishments from one-and-two-family dwelling districts would be just as valid as grounds for excluding such establishments from districts set apart for flats, apartments, hotels, clubs, hospitals, schools and churches. In any event the wisdom or expediency of establishing a primary residential district and also a secondary or *quasi*-residential district and excluding from both commercial and industrial establishments is for the city council to determine in the exercise of its legislative judgment. [Zahn v. Board of Public Works, 234 Pac. (Cal.) 388; Fourcade v. City and County of San Francisco, 238 Pac. 934.]

The fact that the ordinance establishes here and there small commercial districts where stores may be maintained within comparatively short distances from the residence districts does not make it irrational

or discriminatory. The filling station, grocery, drug store, beauty parlor, etc., found in these small isolated commercial districts of easy access to the dwellers in the near-by residence districts serve a distinct and insistent social need. They represent a characteristic phase of urban growth. And of course the use of Lindell as a boulevard in no wise affects the residential use for which the district in question has been set apart.

It is next contended that "respondent's proposed building and its intended use will not cause any of the things the ordinace was designed to prevent—congestion in the streets, danger from fire, panic and other dangers, danger to health and the general welfare, obstructions to light and air, over-crowding of land or the undue concentration of population, interference with provisions for transportation, water, sewerage, schools, parks and other public requirements"—and consequently that the ordinance as it affects respondent is both arbitrary and discriminatory. But if respondent establishes its commercial plant in the district others less innocuous may of right follow. A zoning ordinance cannot permit administrative officers to pick and choose as to who may or who may not occupy a particular use district. If it is not to be condemned as a special law, or as one denying the equal protection of the laws, it must rest upon some rational basis of classification and apply alike to all persons and things falling within a designated class. If through its universality an individual because of special circumstances suffers hardship, that fact does not render the ordinance void as to him. The private interest is subordinate to the public good. [Wulfsohn v. Burden, supra; Spector v. Building Inspector of Milton, supra, l. c. 267.]

The fact that respondent filed its application for a permit before the ordinance went into effect is no reason why it should not be held applicable to respondent from and after it became operative. Respondent held its property subject at all times to every valid exercise of the police power. The filing of its application gave it no vested right. [Spector v. Building Inspector of Milton, supra, l. c. 268.] Had the permit been granted on the date it was applied for it would have conferred upon respondent no additional property right; it would merely have rendered respondent immune from prosecution for violation of the City's Building Code.

The judgment of the circuit court awarding a peremptory writ of mandamus is reversed. *White, Atwood* and *Gantt, JJ.,* concur; *Graves, J.,* dissents in a separate opinion; *Blair, J.,* dissents and concurs in conclusions reached in the dissenting opinion of *Graves, J.: Walker, C. J.,* dissents.

GRAVES, J. (dissenting).—I.  I cannot concur in this opinion, or any part thereof.  It overrules a line of Missouri cases, without even mentioning them.  It should say that cases like St. Louis v. Hill, 116 Mo. 527; St. Louis v. Dorr, 145 Mo. 485, and St. Louis v. Dreisoerner, 243 Mo. 223, no longer state sound law.  Thus in the last case a pertinent ruling on the police power is well stated thus:

**Correcting Judicial Error.**

"The police power is a necessary and wholesome faculty of municipal government, but it only extends to the regulation of employments prejudicial to the public safety, health, morals and good government of the citizenry, and it 'ends where those public interests are not beneficially served thereby.'  [Gunning Co. v. St. Louis, supra, 235 Mo. l. c. 200.]  It cannot sanction the confiscation of private property for aesthetic purposes.  It was not shown in this case that there was any status of affairs in St. Louis which demanded the inclusion within this ordinance of a prohibition against the maintenance of a 'manufacturing plant of whatsoever size, wherein machinery of any kind whatsoever shall be maintained or operated by means of steam, electricity, gas or other motive power, in any building, or any lot of ground within six hundred feet of Tower Grove Park.'

"We think this provision was an unwarranted exercise of power by the municipal assembly; that it is unreasonable on its face; and if applied to the calling of defendant, it would deprive him of the full uses of his property without compensation and without due process of law.  It is therefore void and afforded no warrant whatever for his conviction by the lower court.

"The judgment is reversed and the defendant discharged.  *Brown, C.,* concurs.

"PER CURIAM:—The foregoing opinion of BOND, C., is adopted as the opinion of the court.  All of the judges concur."

The present opinion extends the police power to the destruction of private property and private rights.  Under its definition of police power, there is no limit to the taking of property.  Under its broad doctrine of police power the city authorities could take the whole of a person's property, if it so desired, and that too without a cent of compensation.  If the police power authorizes the taking of a part of the property for public use, by the same token, title as well as use of the property, could be taken.

We adhere to just what we said in the McKelvey case (301 Mo. l. c. 39) thus:

"Our State Constitution is a little broader, in that Section 21 of Article II provides: 'That private property shall not be taken *or*

*damaged* for public use without just compensation.' Note the words
'or damaged' in our constitutional provision. The prop-
**Damage to** erty does not have to be actually taken for the public use,
**Private** but it suffices (for the purpose of compensation) that
**Property.** it be merely damaged in the furtherance of the public
use. It is the uses to which property may be put which gives it value.
Strip it of all its uses and the property is as worthless as the most
barren spot of the Great Desert. Strip it of a part of its legitimate
uses and you have damaged it to the extent of the uses cut off. The
restrictions upon the legitimate use of property inflicted by this
ordinance is a destruction of the property *pro tanto;* and there being
no provision for compensation, the ordinance is void. [St. Louis v.
Hill, 116 Mo. 527; St. Louis v. Dorr, 145 Mo. l. c. 485 et seq., in-
cluding the dissenting opinion of Sherwood and Burgess, JJ.; St.
Louis v. Dreisoerner, 243 Mo. 217.] These three cases condemn the
ordinance here involved. They were well considered. They have
never been overruled and stand as the law of the State today. In
the language of Sherwood, J., in the Hill case, supra, 116 Mo. l. c.
533:

" 'Property, then, in a determinate object, is composed of certain
consistuent elements, to-wit: The unrestricted right of use, enjoy-
ment and disposal, of that object. It follows from this premise that
anything which destroys or subverts any of the essential elements
aforesaid is a taking or destruction *pro tanto* of property, though the
possession and power of disposal of the land remain undisturbed,
and though there be no actual or physical invasion of the *locus in quo.*
[Cooley's Constitutional Limitations (6 Ed.) 670; Wynehamer v.
People, 15 N. Y. l. c. 433, per Selden, J.; People v. Otis, 90 N. Y. l. c.
53, per Andrews, C. J.]

" 'The use of a given object is the most essential and beneficial
quality or attribute of property; without it all other elements which
go to make up property would be of no effect. If the city were al-
lowed to deprive the defendant of the use of his entire lot, it would
leave in his hands but a barren and barmecidal title; and what is
true of property rights as an integer is true of each fractional portion.

" 'If plaintiff's theory be correct, then the city could pass and en-
force an ordinance, which would deprive defendant of the use of his
entire lot, and still there would be no taking within the terms of
Section 21, Article 2, of the Constitution, and consequently, no right
to compensation. The statement of such a position is sufficient to ac-
complish its utter repudiation. The day before the ordinance
went into operation, defendant had the unquestionable right to build
at will on his lot; the day afterwards he was effectually prevented
from building on the forty-foot strip, except under peril of punish-
ment, as if the city had built a wall around it, and this too without

form of notice, any species of judicial inquiry, or any tender of compensation. If this is not a "taking" by mere arbitrary edict, it is difficult to express in words the meaning which should characterize the act of the city.'

"The case was dealing with a restriction upon the use of property upon boulevards, but it is equally applicable to the restrictions upon the use of property involved in this ordinance. In the matter of restricting the lawful use of property there can be no difference between the boulevard and a stated district.

"In the Dorr case, supra, on the strength of the Hill case, supra, it was ruled that an ordinance which prevented a confectionary store on Washington Boulevard in St. Louis was void because violative of the constitutional provision we have above outlined.

"Even the bill-board opinions recognized the rule in the Hill case, but distinguished it in St. Louis Gunning Co. v. St. Louis, 235 Mo. l. c. 151.

"The ordinance before us provides for the taking of private property for public use without compensation and without a judicial hearing. It is not regulation which would fall within the reasonable exercise of the police power. It is a confiscation, pure and simple. The motion for rehearing should be overruled. *Woodson, C. J.,* and *David E. Blair* and *Walker, JJ.,* concur in these views."

No other conclusion can be reached under our Constitution. Right here let me add a word as to the additional restrictions placed in the Constitution of 1875.

My learned Brother says this: "In view of the foregoing it is clear that the addition of the word 'damaged' to that of 'taken' in the eminent domain clause of our Constitution did not **New** broaden its limitation. The amendment operated *to cor-* **Limitation.** *rect an error of construction,* and nothing more."

Opposite to this view of my learned Brother is the view of FARIS, J., in St. Louis v. Railroad, 272 Mo. l. c. 93, whereat he says: "That the change in the wording of our Constitution has broadened the field of consequential damages arising in cases wholly disassociated with an actual physical taking by the exercise of the right of eminent domain, there is no question."

Opposite to this view, expressed in the opinion before us, is the view of this court in McGrew v. Paving Co., 247 Mo. l. c. 563, whereat we said:

"By what we have said above we do not mean that consequential damages to property abutting a street occasioned by a change of grade are not damages which fall within the constitutional provisions of Section 21 of Article 2, supra, but what we do mean is that they are not required to be assessed and paid in advance by reason of

such constitutional provision. As said in Hickman v. City of Kansas City, 120 Mo. l. c. 116.

" 'Prior to the adoption of the Constitution of 1875 (although the doctrine was vigorously attacked in Thurston v. City of St. Joseph, 51 Mo. 510, in the opinion by Judge ADAMS), it was uniformly held that any damage resulting to an abutting property-owner from a change of grade was *damnum absque injuria* for which the municipality was not liable, unless the injury could be shown to have resulted from the negligent or improper manner in which the work was done. [St. Louis v. Gurno, 12 Mo. 415; Taylor v. St. Louis, 14 Mo. 23; Hoffman v. St. Louis, 15 Mo. 656; Schattner v. City of Kansas, 53 Mo. 162; Imler v. Springfield, 55 Mo. 119; Wegmann v. City of Jefferson, 61 Mo. 55; Swensom v. Lexington, 69 Mo. 157; Stewart v. Clinton, 79 Mo. 603.]

" 'To uproot this doctrine, and provide for compensation when property is damaged, as well as when it is taken for public use, the eminent-domain clause in the Constitution of 1865 was amended, by the Constitution of 1875, to read as quoted, and since it has been considered the settled law in this State, that when property is damaged by establishing the grade of a street, or by raising or lowering the grade of a street previously established, it is damaged for public use within the meaning of the Constitution. [Werth v. Springfield, 78 Mo. 107; State ex rel. v. City of Kansas, 89 Mo. 34; Householder v. City of Kansas, 83 Mo. 488; Sheehy v. Railway, 94 Mo. 574; Gibson v. Owens, 115 Mo. 258.]

" 'It is also well-settled law that this article of the Constitution gives an absolute right and is self-enforcing, and although the Legislature may have enacted no law providing a mode for the ascertainment and payment of the compensation provided for, resort may be had by the party entitled to the right to any common-law action which will afford him adequate and appropriate means of redress.' "

We here clearly rule that the Constitution of 1875 gave a right to recover consequential damages to property, where no such right existed before. In other words there was an additional limitation on the right to use property for a public purpose, i. e. if the property be not actually taken, but is actually damaged in its use to the owner, compensation must be paid.

My learned Brother emphasizes this sentence: "The amendment operated *to correct an error of construction* and nothing more." (There was no amendment; the people just adopted a new Constitution). In other words, he says that the courts had erred in the construction of the word "taken" used in the organic law prior to the new Constitution of 1875. The doctrine wiped out by the Constitution of 1875 by using the word "damaged" had its origin long before there was a Missouri or a Missouri Constitution. It bears no *relation whatever* to the word "taken" as used in *any* Constitution

that Missouri ever had. The doctrine is of English origin in the times of George III.—in the 32nd year of George III. [The Governor and Company of the British Cast Plate Manufacturers *against* Meredith and others, 4 Term Reports, p. 794.] By Parliamentary Act there was authority given to grade and pave a street in a place in Surrey. The commissioners authorized to do the work lowered the grade of the street, so that the ingress and egress to the warehouses of plaintiff were not as they had been, and plaintiff sought to recover these consequential damages. So in a common-law action, it was ruled that there was no action for such damages, i. e., that the private must yield to the public convenience. This is the effect of the ruling. Here is the doctrine that the Constitution of 1875 knocked out, as it is well put in Thurston v. City of St. Joseph, 51 Mo. 1. c. 513:

"So if in grading a street it be raised so high as to throw the surface water back upon the lot, or prevent a free access to the street; or if the street be excavated so low as to render the easement of no use to the lot, the lot holder is thereby damaged to the extent of the loss of such easement. The question here is whether the lot holder has any remedy at all for such injuries. The case under consideration is a sewer which the city no doubt had the power to construct. But the gravamen of the complaint is that through negligence in the construction of this sewer, water was thrown on the lot of the plaintiff and thereby injured her property. If we are still to follow the rule as laid down in the City of St. Louis v. Gurno, 12 Mo. 414, and the subsequent cases of Taylor v. St. Louis, 14 Mo. 20, and Hoffman v. St. Louis, 15 Mo. 651, we must deny all remedy for such injuries. In the cases referred to, this court followed the lead of the King's Bench in the Governor, etc., v. Meredith and others, 4 T. R. (D. & E.) 794. The doctrines laid down in that case by Lord KENYON and other judges, in my judgment *are not applicable to America.* The improvements which caused the injury were made under an act of Parliament which authorized the commissioners to allow damages, but the court seemed to place their decision on the ground that *Parliament was omnipotent,* and on this ground alone denied any remedy to the injured party. The court held that as the improvement was *for public convenience,* the maxim '*salus populi suprema lex esto*' applied, and that *private rights must yield to public convenience. The same line of reasoning was maintained by the learned judge who determined the opinion in the leading case of St. Louis v. Gurno.*"

In the City of St. Louis v. Peter Gurno, 12 Mo. 1. c. 424, it is said:

"In the case of the Governor, etc. v. Meredith and others, 4 D. & E. 794; it was held, that where an act of Parliament authorized commissioners to pave, by reason of which an individual was injured in his property, and there was no excess of jurisdiction on the part

317 Mo. Sup.—76.

of the commissioners, neither they nor their servants were liable for such acts. The same point was determined in Sutton v. Clark, 6 Taunt. 42, and Harman v. Tappenden, 1 East, 555.''

At page 418 of the 12 Mo., Judge NAPTON thus states Gurno's case:

''The only question presented by this record, is whether the city of St. Louis is liable to an action for damages consequential upon the grading and paving of a street, directed by the city authorities in pursuance of an ordinance authorized by the city charter. The declaration in this case charged that the work was done so negligently that the water, which before the improvement of the street passed off by a natural channel, was thrown upon the plaintiff's premises, and overflowed his cellar, and otherwise greatly impaired the value of his building; but upon the trial, the court instructed the jury that the corporation was liable for the injury complained of, whether the grading of the street and the culvert constructed to carry off the water were properly made or not. So that the naked question is presented, whether the corporation is answerable in a civil action for consequential injuries of this character, however skilfully her agents may have executed the powers entrusted to them.''

The court ruled that there was no liability under this old English doctrine. So also the case of Taylor et al. v. City of St. Louis, 14 Mo. 1. c. 23 and 24, rests upon the same English doctrine and cites the same case. In this Taylor case it is stated with clearness just what doctrine the court had in mind. That the constitutional provision on eminent domain was not in this line of cases is made clear by Judge NAPTON in this Taylor case, in this language:

''In the present action, the street or alley in question was laid out by the plaintiffs themselves or their ancestor, and the probability of its being graded, when the public interest required it, must have been calculated on when the buildings were erected. To grade a street or alley, already dedicated to public use, is not an exercise of the eminent domain, so as to require compensation. It is not appropriating private property to public use, but simply an exercise of power over what is already public property. The damage resulting, by causing the plaintiffs to rebuild or prop up their falling walls, is consequential and as it is a consequence of the exercise of a power granted by the State to municipal corporations, for public purposes, and the power has not been abused, but skillfuly and discreetly exercised, the city authorities are not responsible.''

In Hoffman v. City of St. Louis, 15 Mo. 651, the doctrine of the Gurno and Taylor cases is approved, and extended to a case where there was an established grade, and property improved according to the grade, but the city later changed the grade and improved the street, by filling it up in front of the two houses theretofore erected on the fixed grade. Free ingress and egress was hampered and the

property damaged. Held, that there was no liability, and so the cases continued to hold until the Constitution of 1875. [Hickman v. Kansas City, 120 Mo. 1. c. 116.] In this case Judge BRACE uses the word "amendment," but this is an oversight because there was no amendment of the Constitution of 1865. There was simply the new Constitution of 1875, and it provided for the payment of consequential damages to property, if damaged for a public use. None of these old cases, beginning with Gurno's case and running clear down the line, say a word about what is meant by the word "taken" as used in the Constitution of 1865, Article I, Section XVI, General Statutes of 1865, page 23. In fact these cases nowhere construe any constitutional provision relative to the taking of private property for public use. There had been no "error of construction" because there had been no construction of a constitutional provision relative to taking private property. What those old cases did was to confirm and adopt an old English doctrine with reference to consequential damages. What the Constitution of 1875 did was to give a cause of action for consequential damages when none existed before, by reason of our court adopting the English rule as to consequential damages. Then how can it be said:

"In view of the foregoing it is clear that the addition of the word 'damaged' to that of 'taken' in the eminent domain clause of our Constitution did not broaden its limitation. The amendment operated *to correct an error of construction,* and nothing more."

First, there was no error of construction, because there had been no construction of any Missouri Constitution in these old cases as to the word "taken" or any other provision relating to the taking of private property for a public use. Secondly, the new Constitution by the use of the word "damaged" created a right of action where under the English rule none existed before. By destroying this English rule the new Constitution broadened the restrictions upon the taking of private property for public use. Theretofore there was no liability for consequential damages, but thereafter there was. If this is not a further restriction upon the taking of private property, what is it? Nor did these old cases misconstrue the English rule; they just followed it. So there was no error of construction of any kind to be corrected.

By no method of fair reasoning can it be said that the use of the word "damaged" in the Constitution of 1875 added nothing to the previous Constitution of 1865. Section 16, Article I, of the Constitution of 1865 reads: "That no private property ought to be taken or applied to public use, without just compensation."

Did the Constitution of 1875 add nothing to that provision? We rather think it did! So that, when attempt is made to show there are no additional restrictions in Missouri's Constitution, as compared with other constitutions where the word "damaged" is not used, it

falls of its own weight. The opinion of my learned Brother cannot stand upon this ground. Missouri's Constitution does differ from others, and this difference is just what makes the trouble with zoning ordinances or laws in this State. Let the people change the organic law, rather than ask a court to ignore it. We shall not discuss this so-called Enabling Act of 1925. [Laws 1925, p. 307.] Such an act would be just as much a violation of the Constitution as would be an ordinance passed in pursuance of such act. The Legislature cannot wipe out the Constitution.

Consequential damages allowed by the Constitution of 1875 are damages to the use of the property. Zoning strikes at the use of property. It limits the use just as much as cutting down an established grade in a street would do. Yes, more, because cutting the grade does not always fully destroy the use. So we earnestly insist that the ruling in Missouri cannot be guided by rulings in States whose Constitutions do not have the word "damaged." The word "damaged" in our Constitution put an additional restriction upon the interferences with private property in pursuance of a public purpose. This additional restriction goes to the use of the property, and the destruction of the use is the foundation of zoning. My learned Brother seems to fully realize this, and hence the effort to show that the additional word "damaged" added nothing to our Constitution. I hope we have demonstrated that it did.

II. After quoting a part of what I say as to eminent domain being but a limited exercise of the police power, and that under the police power and eminent domain in some cases rights in property

**Other Constitutional Provisions.** may be limited, without compensation, whilst other cases require compensation—McKelvey's case, 301 Mo. l. c. 22—my learned Brother asks: "But what are the cases in which rights in property may be limited through the police power, without compensation? and what those which require compensation? What principle of constitutional law determines the classification?"

Had my learned Brother read my two opinions in McKelvey's case, he would have found at least partial answer to his questions. I refer the interested to 301 Mo. l. c. 22 and l. c. 37. Of course the Constitution does not define the limits of the police power, but in no republican form of government can it be said to go to the extent of taking private property except in limited cases. The legitimate use of private property is protected by more than one constitutional provision. In our sacred instrument it is said: "That all persons have a natural right to life, liberty and *the enjoyment of the gains of their own industry;*" this does not mean that if a citizen has a property gained by his own industry, which property could be put to a legiti-

mate use and a non-deleterious use, giving it great value, then such value can be swept away by limiting the use. Yet such is the doctrine of this zoning ordinance. Other constitutional provisions have been cited in McKelvey's case, and still others could be cited.

The Constitution has a provision as to "the police power" of the State. It likewise has a provision as to the "taking and damaging" of private property for public use. The instrument must be so construed as to allow both to stand, if it be possible so to do. The extension of the police power made by the opinion of my Brother wipes out the latter provision of the Constitution relating to the "taking and damaging" of private property for public use.

III. Then again, I dissent, because my learned brother indorses some utterances from a text-writer that I cannot indorse, nor do I think this court wants to indorse it. The opinion before us says:

"The author of a recent text-book on zoning law attempts to answer the question thus: 'The analysis of the cases seems to show that it (the line of difference between the police power and the power of eminent domain) is largely one of degree. Is it rea-. **Advancing** sonable and proper, under all the circumstances, that the **Public** public good sought should be attained without compensa-**Opinion.** tion to those whose rights are to be limited to this end? If, on the whole, those affected are benefited by the measure, if the right surrendered can no longer, in the light of *advancing public opinion*, be retained in fullness by its present possessor, if the sacrifice to him is slight or if the number affected is great, so that compensation is impracticable—in all such cases compensation is not provided for: otherwise the law demands it. In the decision, *history, custom, opinion, as well as surrounding circumstances* play their part.' [Williams on the Law of City Planning and Zoning, p. 25.]"

When did "advancing public opinion" determine a man's right to hold and use his property and his other property rights? If the man owned a valuable piece of property and "advancing public opinion" thought the city ought to have it for some aesthetic purpose, away goes the man's life earnings. Take it under the *fiat* of the police power. "Advancing Public Opinion" says beautify the city. The text indicates this is a factor in determining whether the man shall lose his property without compensation. Since when did "history, custom, opinion, as well as surrounding circumstances play their part" in determining whether the citizen should or should not have pay for his property? Yet such is the doctrine of this new constitutional lawyer that my learned Brother has found. Who is Williams? Who ever heard of him as one versed in deep constitutional questions? His book had to be endorsed by a professor of the Michigan University—this one said to be "Professor of Landscape Design," and another individual who seems to talk about "Land Economics," and

is styled "Director, Institute for Research in Land Economics."
This institute seems to have been founded in 1920. The Michigan
professor is Aubrey Tealdi and the director is Richard T. Ely. Prof.
Tealdi details what Mr. Williams has done on City Planning and
Zoning, which shows that Williams belongs to all kinds of com-
mittees, and societies endorsing zoning, and was a lecturer on the
law of city planning in the "Department of Landscape Design"
in Michigan University. The Professor undoubtedly did not know
whether Mr. Williams, with all the Committees and Societies to which
he belonged in connection with city planning and zoning, had been
blessed with any time to study constitutional law or not and hence
he is silent on that question. Ely speaks with vehemence. He says:

"The purpose of this editorial preface is not to praise the present
work by Mr. Frank B. Williams. If, as I believe, *it is pace-setting*
and *path-breaking,* it needs no words of mine to assign it its proper
place. 'Good wine needs no bush.' My purpose is rather to ex-
plain the position that this book occupies with respect to related
books also published, or to be published, under the auspices of the
Institute for Research in Land Economics."

That Brother Williams is a "Pace-setter" and a "Path-breaker"
is evident from his book. On page 45 he is speaking of the constitu-
tional duplications of the State and Federal Governments. He then
adds:

"Time-honored as it is, there is nevertheless reason to doubt wheth-
er there is sufficient cause for the continuance of this duplication,
often enabling the litigant to appeal first to State and then to na-
tional courts for relief and delay. As passed on by the Supreme
Court of the United States, it is true that these provisions are more
favorable to *modern social reforms* than when construed by most of
the State courts. Few, however, will deny that every essential right
of the individual is protected by the United States courts; and the
abolition of the bills of rights and similar guaranties in the State
Constitutions would certainly simplify procedure and lessen delay
and expense."

He would wipe out all state Bills of Rights, and run the Govern-
ment from Washington. We do not endorse such things. Yet, we
must recollect that we had Tories, even when the life-blood of the
Colonies was at stake during the Revolution. We presume that
Centralized Government will always have its advocates, even in the
United States.

His friends classify the little volume from which we quote. It be-
longs to "The Citizen's Library of Economics, Politics and Sociol-
ogy," said to be edited by Richard T. Ely, Professor of Economics
in the University of Wisconsin. He is the same Ely who wrote the
Editorial Preface to Mr. Williams's book from which we quoted,

supra.  He lists the book along with "The Non-Partisan League," by Andrew A. Bruce, and one to be written, "The Single Tax" by F. B. Garver.  This Citizen's Library has no law writer except Mr. Williams, if he can be called one.

The new author's surroundings are such that I do not feel like incorporating his vagaries upon eminent domain and the police power into our law.  I shall not vote to so incorporate them.

IV.  My learned Brother seizes upon my approval of Van DeVere v. Kansas City, 107 Mo. 83, in the case of Peters v. Buckner, 288 Mo. 1. c. 636, as an endorsement of the doctrine announced in the instant opinion to the effect that the word "damaged" added nothing to Missouri's Constitution, and that its sole purpose was to "correct errors of construction" in previous cases.

**Approval of Van DeVere v. Kansas City.**

Our opinion in the Peters case shows just what we had in mind, when defending the Van DeVere case.  At page 637 of 288 Missouri, in speaking of the Van DeVere case, we said:

"This opinion included an easement directly connected with the property as within the constitutional provision, and all the line of cases following it do the same thing.  This is the doctrine that my brother overrules.  It is a fair construction of the Constitution of 1875, and one that has been followed in more than a score of cases, and we do not feel that this line of cases (much longer than our brother cites) should be overruled.  They have been consistent throughout, and announce (1) that under the Constitution an easement appurtenant to a property cannot be taken or damaged without compensation being paid, and (2) that if the damages claimed are the same as those suffered by all others, although different in degree, then such damages were not included in the term 'damaged' as used in the Constitution.  This has been the rule in the sundry cases from the Van DeVere case in 107 Mo. to the Gorman case in 255 Mo., supra.  I do not feel that these cases are wrong, but they do not determine the instant case."

This shows just what we had in mind when we opposed our late Brother WOODSON in an attempt to overrule the Van DeVere and other cases.  We never thought of the view that the purpose of using the word "damaged" was to correct wrong interpretations by this court placed upon the word "taken" as used in the previous organic law.  We had no idea of endorsing that doctrine.  Unfortunately, like Judge BRACE in the 120 Mo. supra, and Judge BLACK in the Van DeVere case, supra, we mistakenly spoke of the use of the word "damaged" as an amendment to the Constitution.  It is too plain for serious argument that there was no amendment to the Constitution of 1865, the only one existing from 1865 to 1875.  In 1875 we

had a new Constitution, and not an amendment of our old one. It granted many rights where none existed before. Among the many was the right to sue for and recover consequential damages where the damages were occasioned in pursuance of a public use. And may we repeat again that there never had been a construction of a constitutional provision relative to taking private property for public use, in the old cases cited by Judge BLACK in Van DeVere's case. Having been no construction there was none to be corrected by the Constitutional Convention of 1875. But as we have said, supra, the Constitution of 1875 did destroy the English rule as to consequential damages, and gave a new right, where none theretofore existed, either by constitution, statute or common law.

We have not the time to collate all the Missouri cases upon police power. Certain it is that we have never extended the police power to the taking or damaging of private property simply because it would help a majority of the citizens of a given district to have this confiscation made. We have held just the contrary for all these years. If they want zoning (and in some ways it may be a good thing), let them amend the organic law so as to allow them to take private property, without compensation, for that purpose. Let the "Public Opinion," so strong in the mind of Mr. Williams as evidenced by his book on "The Law of City Planning and Zoning," so operate as to procure the necessary changes in our organic law by the people of Missouri. Don't ask this or any other court to ignore the plain provisions of the Constitution. We most respectfully, but vigorously dissent. *Blair, J.*, concurs in the conclusions reached in this opinion.