William **ALLEGA** et al. (139 other plaintiffs), Plaintiffs-Respondents,

v.

**ASSOCIATED THEATRES, Inc., Martin B. Dickinson, Executor, etc., The City of Independence, Missouri, and Robert B. Waddill, Defendants-Appellants.**

No. 22414.

Kansas City Court of Appeals.

Missouri.

Oct. 1, 1956.

J. Marcus Kirtley, James L. Gillham, Independence, Martin B. Dickinson, Kansas City, John F. Thice, Independence, for appellants.

Spencer, Fane, Britt & Browne, Arthur J. Doyle, Cornelius Roach, III, Kansas City, for respondents.

CAVE, Judge.

 This is an action to have a rezoning ordinance of the City of Independence declared invalid because its provisions do not come within the purview of Ch. 89. RSMo 1949, V.A.M.S. The constitutionality of the ordinance was not decided by the trial court and is not called in question on this appeal, consequently this court has jurisdiction. Secs. 3 and 13 of Art. V, 1945 Constitution, V.A.M.S.; Juengel v. City of Glendale, Mo., 161 S.W.2d 408; Fischback Brewing Co. v. City of St. Louis, 337 Mo. 1044, 87 S.W.2d 648; McGill v. City of St. Joseph, Mo., 31 S.W.2d 1038; and Smith v. City of Sedalia, 228 Mo. 505, 128 S.W. 735.

The petition alleges that the City of Independence is a municipal corporation having a population in excess of 10,000 inhabitants; that in 1950, the city council enacted a basic zoning ordinance for the entire city, and classified the tract in question, approximately 20 acres, together with the adjoining territory, as Districts "A" and "B" (Residential); that in 1954 the council amended the basic ordinance and reclassified the 20 acre tract as District "E" (General Business); that the amending ordinance was invalid in that it was unreasonable, uncertain, discriminatory, arbitrary, and constituted "spot zoning", and in certain respects, exceeded the statutory authority conferred on the city by Ch. 89, and particularly Secs. 89.020 and 89.040; and prayed that the ordinance be declared invalid and that the defendants be prohibited from constructing and operating a drive-in theater on said tract.

The answers of the defendants are similar and in effect allege that the amending ordinance was enacted by the council after affording all persons, and these plaintiffs in particular, due notice of the application and the nature thereof; that a full hearing of the matter was had; that the plaintiffs are not owners of any property which could be injuriously affected by the amending ordinance; and deny that the ordinance is unreasonable, arbitrary, discriminatory, or constitutes "spot zoning".

The defendants are the City of Independence; Robert B. Waddill, the city engineer; Martin B. Dickinson, pro se and as Executor of the Estate of William B. Dickinson, deceased, the owner of the property in question; and Associated Theatres, Inc., a Missouri corporation, which was under contract to purchase the property for the erection and operation of a drive-in theater. The plaintiffs are property owners in the vicinity of the rezoned tract. Originally there were 248 persons joined as plaintiffs, but at the beginning of the trial, 108 voluntarily dismissed their cause without prejudice.

After an extended trial, the court held the amending ordinance invalid because it was contrary to the purposes and intent of Ch. 89, and particularly Secs. 89.020 and 89.040; was "spot zoning"; and enjoined the defendants from constructing and operating a theater on the rezoned tract. Defendants appealed and contend that the evidence does not support the judgment. Specifically, the defendants assert that in a proceeding to invalidate a city zoning ordinance the plaintiffs have the burden of proving the invalidity beyond a reasonable doubt, and that, in this case, the evidence failed to so show; that "at the very most, it may be said that the reasonableness of this ordinance was debatable".

For a clearer understanding of the relevancy of the evidence, we refer to certain statutes. Sec. 89.020 provides that, "For the purpose of promoting health, safety, morals, or the general welfare of the community, the legislative body * * " of certain municipalities may enact zoning regulations. But such regulations must have some reference and relation to the purposes and objects stated in Sec. 89.040, which provides: "Such regulations shall be made in accordance with a comprehensive plan and designed to lessen congestion in the streets; to secure safety from fire, panic and other dangers; to promote

health and general welfare; to provide adequate light and air; to prevent the overcrowding of land; to avoid undue concentration of population; to facilitate the adequate provision of transportation, water, sewerage, schools, parks, and other public requirements. Such regulations shall be made with reasonable consideration, among other things, to the character of the district and its peculiar suitability for particular uses, and with a view to conserving the values of buildings and encouraging the most appropriate use of land throughout such municipality."

There are approximately 500 pages of testimony. We shall state the substance and effect thereof.

In 1950, the city council adopted a basic zoning ordinance for the City of Independence, and divided the city into Districts "A", "B", "C", "D", "E", "F" and "G". The area involved in this controversy was zoned as Districts "A" and "B" (except a strip 200 feet wide to be referred to later), and is bounded by the following streets; on the south by Independence Avenue, or Highway 24; on the west by Pleasant Street; on the north by Jones Street and on the east by Wilcox Road. This area is approximately 1½ miles east and west and ½ mile north and south. In District "A" there may be constructed: (1) dwellings, one-family; (2) churches and community buildings; (3) public parks and playgrounds; and (4) public schools, elementary and high, together with other uses not pertinent here. In District "B" there may be constructed (1) any building for any use permitted in District "A", and (2) two-family dwellings, and certain other structures not pertinent. The exception referred to above is a strip of land 200 feet wide north of and paralleling Independence Avenue or Highway 24, which was zoned as Districts "D" and "E" for local and general business uses.

In May, 1953, an application was made to the council by the defendant Associated Theatres, Inc., and Mr. Dickinson, to re-zone a certain area of approximately 20 acres and designate it District "E" (General Business). The purpose of this application was to permit the construction of a drive-in theater on the 20 acre tract. A public hearing on the application was held before the City Planning & Zoning Commission and many protestants appeared. The commission recommended that the proposed change be denied, primarily because the plan submitted did not provide convenient and sufficient exits from the theater grounds. In December, 1953, another application was filed with different exits provided. A hearing was held, with many protestants appearing, but the commission recommended that the tract be rezoned as District "E". On January 11, 1954, the council met to consider the report of the commission. The record of that meeting recites, "A number of citizens were present protesting against the change in the zoning classification of property * * * for a Drive-in Theater as applied for by the Associated Theaters Association. A protest petition was also presented purporting to have the signatures of 513 citizens. It was explained that under the law only those property owners whose property is within 185 feet of the proposed location were eligible to protest, and that there was no protest from the School Board and others within the above mentioned limits." It is also in evidence that the Parent-Teachers Association of the adjacent schools presented a petition requesting that the tract be not rezoned. The council proceeded to amend the basic ordinance as recommended by the commission, and this suit followed.

There is no dispute about the general situation surrounding the rezoned tract. It is bounded on the north and south by land owned by the public school district. The school tract on the south contains 40 acres upon which is a junior-senior high school, stadium and playgrounds, and the tract on the north contains 13.9 acres, upon which is an elementary school with playgrounds. On the east of the rezoned tract is land

owned and operated for public pleasure, such as fishing and picnicking, and known as "McComas Lakes", and also "Jensen's Kiddie Land", catering to the amusement of children. Both of these tracts were and are zoned as District "A", but their present use is permitted so long as they so continue, under the Non-Conforming Uses, of Sec. 15 of the Ordinance. To the west of the rezoned tract is all residential territory, classified as "A" and "B". In other words, the rezoned tract is completely surrounded by territory which is zoned as classifications "A" and "B".

There are two principal streets frequently referred to by the witnesses as land marks. These are: Independence Avenue or U. S. Highway 24, a four-lane trafficway, which extends east and west through the northern part of the city and immediately south of the high school tract; and Noland Road, which is a north and south two-lane paved street and immediately west of the school and theater tracts. These streets intersect ¼ mile south of the entrance to the theater grounds. Noland Road south of Highway 24 carries the traffic of U. S. Highway 71 By-pass. Highway 24 is a national east-west road, and No. 71 By-pass is a national north-south road. The average daily traffic volume at this point is approximately 17,000 vehicles, and increases on Sundays to a flow of 21,500.

Between Noland Road (north) and the theater site is a short street referred to as "North High Street", which extends north and south for two or three blocks. There are lots on both sides of this street, 140 feet in depth. All the lots on the east side are vacant and owned by the Dickinson Estate. On the west side of this street are 6 homes, 2 of which have been there several years, but the other 4 were constructed in 1953.

The entrance to the theater will be from Noland Road. The width of the entrance will be 80 feet, and is at the southwest corner of the tract. At the southeast corner there will be an exit road 50 feet in width and extending south to Highway 24. The theater grounds proper will accommodate a maximum of 750 automobiles. The theater company plans to exhibit two shows each evening, from about 7:30 P.M. to 11:30 P.M. From experience of other outdoor theaters, it is anticipated that the theater will never have more than 50% of its capacity at a particular time, because patrons will be arriving and leaving continuously.

So much for the general situation. The conflicting oral testimony may be summarized as follows:

Mr. Feuchter, an expert traffic engineer, who inspected the territory, and certain maps and plats, testified that the present volume of traffic at various times creates "minor congestion" in plaintiffs' residential neighborhood; that such minor congestion is, in part, due to the narrow paved streets in the area, where parking on both sides of the street is permitted; that theater traffic for the first show would cause additional congestion at Highway No. 24 and Noland Road, and motorists, in order to avoid such congestion, would disperse into and filter through plaintiffs' residential neighborhood to get to the theater; that theater traffic arriving for the second show, when added to that leaving the first show would cause "quite a little congestion" at Noland Road and Highway No. 24, and would result in dispersion of additional traffic through plaintiffs' residential section; that when athletic and other events are held at the stadium and schools there would be "tight congestion" in that area, because those attending the school events park their cars along the streets in the neighborhood; that such congestion would increase the accident potential and the number of accidents occurring; that on evenings when school events are held and parking is permitted on the side streets, the additional volume of theater traffic during periods when shows would be changing would result in "almost an impossible movement" of traffic "which would

be almost impossible to get through", and would cause considerable congestion in "the greater portion of the neighborhood".

He further testified that the exit of theater traffic at a point in a valley and on a curve of Highway No. 24 is bound to increase traffic hazards, even with warning signs, signals, and traffic control devices; that the additional traffic and traffic congestion created by the theater would be attended by increased nuisances such as blowing of horns, noisy motors, dust, and additional hazards where children might be playing or crossing the streets and intersections, all requiring additional police personnel to direct traffic during critical periods; that traffic control facilities would not be satisfactory, especially along Highway 24 where there is quite a difference in speeds; that serious problems would result from the inability of emergency vehicles such as fire equipment, ambulances, and police cars to respond immediately to calls in the area, due to the congestion. With respect to the location of the theater between the school properties, he stated that there would be an additional police problem because of strangers in the neighborhood and possible molestation of children, "which is quite prevalent at this time". As an expert in traffic and police problems, he gave it as his opinion that the operation of a theater at the proposed location would not tend to lessen congestion in the streets; would not tend to secure the inhabitants in the area from fire, panic, or other dangers; would not tend to facilitate the adequate provision of transportation, schools, parks, and other public requirements; and would not tend to promote the health and general welfare of the inhabitants in the area, but, on the contrary, would be antagonistic thereto.

Plaintiff Donaldson owns a home at 1410 North High Street 300 feet north of the theater entrance. He testified that he entered into a contract for the purchase of his home on November 20, 1953, about three weeks before the second application for rezoning was filed; and at that time there were two occupied homes on North High Street and three others under construction.

Mr. Ward, a contractor and builder in Independence, testified that he and Bob Warder were owners of W & W Home Builders, which built the three new homes on North High Street, having secured FHA loan guaranty commitments after the first application for rezoning was denied; that construction of those houses commenced in July, 1953; that he had some negotiations concerning the purchase of the proposed theater site from the Dickinson Estate; and that such site was definitely suitable for residential development. In his opinion, approximately 94 homes, in the $10,950 bracket, could be built on the theater site.

Plaintiff Mrs. Allega, who has lived at 1404 North High Street since 1943, testified that there were two single-family residences on North High Street in December, 1950; that there were three additional homes built on that street in 1953; that the new elementary school, immediately north of the theater site, will be for children in kindergarten to the sixth grade, with a large gymnasium; that evening activities held at the junior and senior high schools, immediately south of the theater site, include football games in the fall; church league baseball games during the summer; and monthly parent-teacher association meetings during the school year; and that people attending these public events park their automobiles on the streets adjacent to or near the theater site. Her home is located 250 feet north of the entrance to the theater.

Mrs. Andes, another plaintiff, who has lived at 1414 North Main Street for six years, testified to substantially the same set of facts as Mrs. Allega.

Another witness presented by plaintiffs was Charles L. Coleman, Chief Underwriter of the Federal Housing Administration (FHA) for the Western District of Missouri, who, for the past eight years, has

been engaged in making appraisals of residential properties. He testified that, in his opinion, if a drive-in theater was located on the rezoned tract, it would have an adverse, depreciatory effect upon the market value of the residences in the 1400 block along North High Street; that if the operation of the theater resulted in traffic congestion in the residential area west of Noland Road, and north of Highway 24, it would have a tendency to depreciate the market value of residential properties in that neighborhood; and that the FHA would take such factors as congestion in the streets, noises from horns and mufflers, and other nuisances attendant upon traffic congestion in a residential area, into consideration in determining the extent to which it would guarantee loans on residential properties. He further stated that the FHA would not make a loan commitment on residential properties adjacent to a business property, and that the introduction of businesses into a residential area tends to depreciate, not conserve, the value of residences in that area.

Plaintiff Schoop, who has lived on Dickinson Road, east of the theater site, for 38 years, testified that there is a new school building on the 40 acre tract immediately south of the theater site, and a new elementary school immediately north of the site; that the general character of the neighborhood west of the schools and theater site, and north of Highway 24, is almost entirely residential, containing mostly one-family residences, with paved streets and mature trees; that these homes have a well-kept and neat appearance; that there are few vacant lots; that a church is located in the area; and that north of the theater site and adjacent to the elementary school property, is a new residential development with about 80 homes already constructed and others under construction.

The last witness presented by the plaintiffs was Joseph E. Stern, a realtor and appraiser of long standing. His qualifications are not questioned. He was engaged to make a study of the effect of the location of

a drive-in theater on the rezoned tract. He made a thorough examination of the neighborhood. His opinion was that the houses in the neighborhood would be valued in the $8,000 to $12,000 bracket; that the construction of the theater would tend to depreciate the market value of the homes in the residential territory; that the homes on North High Street would be reduced about 20 per cent; those on the west side of Noland Road would be reduced about 15 per cent; and those further west would be reduced about 10 per cent; that the location of the schools was an important factor in the value of residential properties; and that, in his opinion, the location of the theater would tend to discourage development of single-family residences on the unimproved lots in the whole area.

Defendants' evidence: Martin B. Dickinson, one of the defendants, testified that the tract involved was presently owned by the four sons of the late W. B. Dickinson; that in 1919 his father acquired the land in Edgewood Park Addition, which had been platted in 1887; that it has always been, and is now, vacant and unimproved, without sewers or other public improvement facilities; that the north half of Edgewood Park Addition, which is outside the city limits, was well adapted to residential use and had, in fact, been sold to Lou Kramer, who purchased the property for residential development with full knowledge of the proposal for the erection of the theater to the south; that the topography of the theater site is not adaptable for residential use; and described in detail certain hills, ravines and abandoned ponds on the site.

He stated that in the area west of Noland Road, where most of plaintiffs reside, only about one-third of the property is improved; that the tracts are fairly large and there is about one house on three or four lots; that in his experience and observation the roads in the area to the west of Noland Road are rough, narrow and oiled; that they are not used by motorists as through traffic; that the arterial road is Noland Road, which is paved; that east

and west traffic does not exist because the streets "go up and down hill", and are narrow oiled roads which are not suitable for through traffic. He stated that he sold four lots to the W & W Construction Company, a co-partnership, which constructed four houses on High Street; that the firm was notified by him of the pending theater application and were continuously informed that the theater site would be rezoned for business use.

Mr. Jones, a member of the city council, and chairman of the City Planning and Zoning Commission, testified that the committee held hearings on the first application for a theater on the site in question, and recommended denial of the petition for the reason that the Commission feared a traffic hazard would result because all of the traffic, both to and from the theater, would be carried on Noland Road. However, the commission recommended approval of the second application, because the plot plans of the theater were revised so that the entrance traffic would be from Noland Road, and departing traffic would be over a new road at the southeast corner of the theater site directly to Highway 24.

Mr. Carmichael, an Independence realtor, testified that the area west of the theater site, that is, west of Noland Road, north of Highway 24, south of Jones Street, and east of Liberty Street, the area in which most of the plaintiffs reside, would not be adversely affected by the erection of the theater because of the low value area situated along the first block or two west of Noland Road; that the theater site represents about the only isolated area in the city; that in his opinion the influx of business, and particularly a drive-in theater, would not affect the value of homes on High Street; that the trend of residential development in Independence is in the south part of the city; that the area to the west of the theater site is obsolete; and that a drive-in theater would be beneficial to the community.

Mr. Lund, another local realtor and the broker for sale of the theater site, testified substantially the same as Mr. Carmichael with respect to the impact of a theater on this area.

Mr. Manning, Planning Engineer for Jackson County, testified that he, as an individual and not as an official, made inspection of the area; that in his opinion the topography of the area and the drainage situation discourages the use of the theater site for homes; that traffic would not be a problem; that the area was well suited for recreational use and that a drive-in theater would be a proper use for the tract; that such a theater would not cause value depreciation but would be beneficial; and that, in his experience, traffic tends to avoid side streets and could be controlled to avoid congestion.

Mr. Becker, assistant general manager of the defendant theater corporation, made studies of the plans, layout and operation of the proposed theater, and stated that while the theater capacity was 750 cars, they expected an average attendance of about 50 per cent per evening; that about 15 per cent of the patrons arrive before or at the start of the first show and patrons filter in until about thirty minutes of that show; that the peak attendance is reached about two-thirds of the first show; that about 50 per cent of the patrons leave after the first show, and the rest filter out; that High Street will be kept open for the public; that traffic control facilities will be furnished by the company as required by the city; that the new road south to Highway 24 will be constructed by the company as and for a 50-foot public street and traffic will be controlled at that intersection; that lighting in the theater is of the low curb type; that audio facilities consist of individual car speakers, and there will be no loud noises; that the theater screen will be located in the southeast corner of the site, removed from any residence; that inside the entrance to the theater there is a

"hold-over area" for cars to prevent congestion on the streets; that there will be an attractive fence enclosing the site; and that the pictures will be shown from about 7:30 P. M. until about 11:30 P. M., but on special occasions, such as week-end holidays, the shows may continue through the night.

It is apparent that there is rather sharp conflict in the oral testimony as to (1) whether the rezoning of the tract and the construction of the theater will cause increased and disagreeable traffic congestion and other hazards, such as impeding fire, ambulance and police services; (2) the extent of the damage, if any, to the value of the property in the affected area; (3) whether the rezoned tract is suitable for residences; and (4) whether the rezoning is in keeping with the character of the district and its peculiar suitability for particular uses. In the judgment, the trial court specifically found these conflicts against the defendants.

In Flora Realty & Inv. Co. v. City of Ladue, 362 Mo. 1025, 246 S.W.2d 771, 777, the court en banc was discussing the validity of a zoning ordinance wherein there was conflict in the oral testimony on similar issues, and said: "The trial court saw and heard the witnesses and was in a better position to judge of their credibility and the weight and value to be given to their testimony. * * * We should and do defer to the trial court's findings on these fact issues." We do likewise in this case.

 However, in a proceeding attacking the validity of a zoning ordinance, the trial court, and the appellate court, must keep in mind certain well established principles of law. It has been held that a zoning ordinance, having been enacted by the legislative body of a municipality pursuant to the police power, is presumed to be valid, and those challenging its validity have the burden of proving the invalidity thereof; and unless it appears that the ordinance is clearly arbitrary and unreasonable, the court cannot substitute its opinion for that of the council, or if the question is reasonably doubtful or even fairly debatable, the court cannot do so. Flora Realty & Inv. Co. v. City of Ladue, supra; Landau v. Levin, 358 Mo. 77, 213 S. W.2d 483; Kellog v. Joint Council of Women's Auxiliaries Welfare Ass'n, Mo., 265 S.W.2d 374. These three decisions cite an array of cases from this and other jurisdictions to the same effect. It has also been held that a city council must exercise the same careful, serious and intelligent consideration of an amendment to a zoning ordinance as is required in the preparation and enactment of the original ordinance. Wippler v. Hohn, 341 Mo. 780, 110 S.W.2d 409.

It is apparent that the purposes to be accomplished by Secs. 89.020 and 89.040 cover a wide range and are, of necessity, defined in general terms. Certainly, these sections prescribe some limitations on the authority of a city council to enact zoning ordinances or to amend an existing ordinance.

What is now Ch. 89 was first enacted by the legislature in 1925, Laws 1925, page 307 et seq. Prior to that time our courts had taken a very strict and narrow view of the power of a municipality to restrict the uses of private property. See City of St. Louis v. Hill, 116 Mo. 527, 22 S.W. 861, 21 L.R.A. 226; City of St. Louis v. Dorr, 145 Mo. 466, 467, 41 S.W. 1094, 46 S.W. 976, 42 L.R.A. 686; City of St. Louis v. Dreisoerner, 243 Mo. 217, 147 S.W. 998, 41 L.R.A.,N.S., 177. But in 1927, in State ex rel. Cadillac Co. v. Christopher, 317 Mo. 1179, 298 S.W. 720, the court en banc held that zoning ordinances, as such, were not unconstitutional as being in violation of the provision against taking or damaging property without just compensation. Since that time, our courts have become more liberal in sustaining zoning ordinances unless, under the particular facts in each case, it is found that the ordinance is arbitrary and unreason-

able; and not in keeping with the purposes enunciated in the statutes.

■ The perplexing question is whether the evidence in this case clearly establishes that the amending ordinance is so arbitrary and unreasonable, and not in keeping with the purposes stated in the statutes, as to be unenforceable.

The leading case outlining the grounds upon which zoning ordinances may be sustained is Village of Euclid, Ohio v. Ambler Realty Co., 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303, 54 A.L.R. 1016. Among other reasons given by the court for sustaining such ordinances, it is stated, at page 391 in 272 U.S., at page 119, 47 S.Ct.: "The decisions enumerated in the first group cited above agree that the exclusion of buildings devoted to business, trade, etc., from residential districts, bears a rational relation to the health and safety of the community. Some of the grounds for this conclusion are promotion of the health and security from injury of children and others by separating dwelling houses from territory devoted to trade and industry; suppression and prevention of disorder; facilitating the extinguishment of fires, and the enforcement of street traffic regulations and other general welfare ordinances; aiding the health and safety of the community, by excluding from residential areas the confusion and danger of fire, contagion, and disorder, which in greater or less degree attach to the location of stores, shops, and factories. * * ". If such purposes are valid reasons for sustaining an ordinance which seeks to exclude or prevent those conditions from arising in a classified area, it would seem to follow that an ordinance which brought about the reverse or a contrary condition would be invalid. Apparently our statutes so contemplate.

Sec. 89.040 includes such conditions, among others. It provides that the zoning regulations shall be "designed to lessen congestion in the streets; to secure safety from fire, panic and other dangers; to promote health and the general welfare * * * to facilitate the adequate provision of transportation, * * * schools, parks, and other public requirements. * * *" The evidence in this case strongly supports the conclusion that the location of the theater on the rezoned tract would not lessen congestion in the streets, but would greatly increase the same; that it would not tend to secure safety from fire, panic and other danger, but would increase the same; that it would not facilitate the adequate provision of transportation, schools, parks, etc., but would restrict, hamper and interfere with the full uses thereof. The statute also provides that such regulations shall be made with reasonable consideration for conserving the value of other buildings. The evidence strongly supports the conclusion that the construction of the theater would materially depreciate the value of the homes in that immediate area.

The statute also provides that "such (zoning) regulations shall be made in accordance with a comprehensive plan" to accomplish the above and other purposes. The basic ordinance passed in 1950 classified this area as Districts "A" and "B"; that is, residences, schools, churches, parks, etc. The amending ordinance departs from this "comprehensive plan" and sets aside a tract, almost in the center of the general area, for business purposes and upon which it is proposed to construct a drive-in theater. Such action does not seem to us to be in accordance with the original comprehensive plan and there is no evidence of changed conditions to support a departure from the original plan. In fact, the evidence is that the recent construction of the school buildings makes the tract more desirable for residences than it had theretofore been.

A very similar issue was decided by the Supreme Court of Rhode Island in Abbott v. Zoning Board of Review, 78 R.I. 84, 79 A.2d 620, 624. There the Zoning Board had granted a permit for the construction and operation of a drive-in theater on a 12¾

acre tract in a residential "B" zone. The court held this was an "abuse of discretion"; and that the board was not warranted in granting an exception which would permit the introduction of a new business of such size and character in a residential zone.

We are cited to no Missouri case discussing a similar set of facts as shown in the instant case. The development of the drive-in theater as a source of public entertainment is of very recent origin. They require substantial acreage and are usually located outside city limits. It seems rather incongruous that such an establishment should be permitted in the midst of residences, schools, churches and similar community advantages; and within six blocks of the principal business district of a city (Independence) having a population of approximately 40,000. In Euclid, Ohio v. Ambler Realty Co., supra, the court held in effect that the power to permit or forbid the erection of a building of a particular kind or for a particular use is to be determined, not by an abstract consideration of the building or of the thing considered apart, but by considering it in connection with the surrounding circumstances and the locality. It "may be merely a right thing in the wrong place,—

like a pig in the parlor instead of the barnyard". There is nothing inherently evil, dangerous or obnoxious about a drive-in theater. But its location in a specific neighborhood may be entirely out of harmony with its surroundings, which creates an intolerable situation.

This case is not similar to and is not to be controlled by the line of decisions which hold valid an ordinance permitting the operation of small neighborhood shops which provide essential services to a surrounding residential community.

We have read the many cases cited in the briefs, all of which announce certain general principles of law relating to zoning ordinances. One of such general principles is that each case must be decided according to its own peculiar facts. We are of the opinion that the facts in the instant case distinguish it from many of the cases cited. From the conclusion we have reached, it is unnecessary to decide the question of whether the ordinance constitutes *spot zoning*.

The judgment should be affirmed. It is so ordered.

All concur.